ALBERT B. MALONEY and ETHEL L. MALONEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Maloney v. Commissioner
Docket No. 4606-73.
United States Tax Court
T.C. Memo 1975-286; 1975 Tax Ct. Memo LEXIS 90; 34 T.C.M. (CCH) 1237; T.C.M. (RIA) 750286; September 15, 1975, Filed I. R. Schulman, for the petitioners. Robert B. Nadler and Jack D. Yarbrough, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in the Federal income tax of petitioners as follows: FYE
Deficiency
September 30, 1965
$28,241.10
September 30, 1966
30,077.49
September 30, 1967
2,997.46
September 30, 1968
3,685.35
Concessions having been made, it remains for us to decide: 1. if amounts which Albert B. Maloney was required to pay in satisfaction of guarantees which he had given with respect to the obligations of a corporation in which he held a controlling stock interest were deductible as business bad debts or non-business bad debts; 2. if an amount loaned by Albert B. Maloney for which he was not reimbursed was deductible as a business bad debt or non-business bad debt; 3. if petitioners claimed excessive depreciation deductions with respect to improved real estate purchased in 1965; 4. if petitioners claimed excessive depreciation deductions with respect to improved real estate *92 purchased in 1967; and 5. if petitioners were entitled to claim an interest expense deduction in the amount of $12,900 for the fiscal year ended September 30, 1965. GENERAL FINDINGS OF FACT Petitioners Albert B. and Ethel L. Maloney are husband and wife. They filed joint Federal income tax returns for the years in issue with the Southeast Service Center, Chamblee, Georgia. They reported income and expenses in accordance with the cash receipts and disbursements method of accounting. Statutory notice of the deficiencies in issue was mailed on March 22, 1973. Petitioners were residents of Nashville, Tennessee, when they filed their petition with this Court. Issue 1. Bad Debts (Wedgewood)
FINDINGS OF FACT Albert became a certified public accountant in 1939. In the following year he organized the firm of Albert B. Maloney & Co. to engage in the practice of his profession in Nashville, Tennessee. In 1956 Albert B. Maloney & Co. was merged into Ernst & Ernst, a national firm of certified public accountants. For several years Ernst & Ernst employed Albert to manage the practice which he had developed. He was admitted to the firm as a partner in 1960. On September 30, 1966, he *93 retired. While he was actively engaged in the practice of his profession, Albert invested in several enterprises, both incorporated and unincorporated, which either had been availing themselves of his services as an accountant or were to do so after he acquired an interest in them. These clients regularly compensated Albert B. Maloney & Co. and later Ernst & Ernst for the accounting services rendered by Albert and his staff. Albert not only served the clients in which he invested as an accountant, he also participated actively in the formulation of their policy and procured loans for them on the strength of his personal guarantee. Albert did not require a fee for these additional services unless the client on whose behalf the services were rendered was realizing such a profit from its operations that payment of such a fee would not have been burdensome. In June 1960 Albert acquired a controlling (84 1/2 percent) interest in the Wedgewood Corporation, a client of long standing. Wedgewood owned and operated a furniture manufacturing concern which had been profitable at one time but which had been declining for several years when Albert invested in the corporation. In an attempt *94 to revitalize Wedgewood Albert procured several loans for it from the Third National Bank of Nashville in the years 1960 through 1964. As an inducement to the bank Albert personally guaranteed that the loans would be repaid. Albert did not require a fee for these guarantees in view of Wedgewood's insecure financial position. Albert's effort to revitalize Wedgewood proved unavailing. The corporation ceased its operations in November 1964; and in the following year Albert was required to honor the guarantees which he had made on Wedgewood's behalf. OPINION The parties to this controversy agree that petitioners are entitled by section 166[1] to deduct $88,242.40 and $14,779.61 which Albert paid on guarantees of Wedgewood's obligations in the fiscal years ended September 30, 1965 and 1966, respectively. Respondent determined that the above items were non-business bad debts deductible under section 166(d). Petitioners contend that the guarantees were proximately related to Albert's trade or business; and that the amounts paid on the guarantees were therefore fully deductible in the years when they were paid under section 166(a). *95 Of singular significance in this controversy is that Albert did not regularly require a fee from clients in which he had invested when he guaranteed the repayment of loans made to them. Whether or not he was compensated for this service depended upon the financial condition of the client on whose behalf the guarantee was given. This forecloses our holding that in and of itself, the guaranteeing of loans constituted a business within the intendment of section 166. Whipple v. Commissioner,373 U.S. 193, 202-203 (1963). Insofar as we can ascertain from the record, Albert's sole business activity was the practice of accounting, first independently, then as an employee of Ernst & Ernst, and lastly as a partner in that firm. If petitioners are to prevail on this issue, Albert's dominant purpose in guaranteeing Wedgewood's obligations must have been to promote his practice of accounting. United States v. Generes,405 U.S. 93 (1972). Petitioners contend that Albert's purpose in procuring loans for Wedgewood by personally guaranteeing that they would be repaid, was to insure that Wedgewood's patronage of his firm could continue. The burden *96 of proving this contention is on petitioners. Hogue v. Commissioner,459 F.2d 932 (10th Cir. 1972), affg. a Memorandum Opinion of this Court. In our opinion petitioners have failed to sustain this burden; for the record does not indicate that Wedgewood's patronage was so important to the firm that in an effort to preserve that patronage Albert would have committed himself on Wedgewood's behalf to the extent that he did. The record discloses that Albert was willing to commit himself substantially in guaranteeing loans made to clients, such as Wedgewood, in which he had invested. As in the case of Wedgewood, he did not require compensation for such guarantees if payment of a fee would be financially burdensome to the client. In our opinion such behavior is characteristic of an investor seeking to protect his investment. Whipple v. Commissioner,supra.We therefore hold that the items in issue are deductible as non-business bad debts under section 166(d). Issue 2. Bad Debt (Brown)
FINDINGS OF FACT Albert owned a 50 percent stock interest in the Broad Street Corporation. Broad Street leased equipment to the West Coast Tapering *97 Company. In October 1964 Albert loaned $25,000 to William H. Brown, the president of West Coast. In September 1966 Brown filed a petition in bankruptcy. As of that time Brown's obligation to Albert was wholly worthless. OPINION The parties are agreed that petitioners are entitled under section 166 to deduct the $25,000 which Albert loaned to Brown. Respondent determined that this item is a non-business bad debt deductible under section 166(d). Petitioners contend that Albert loaned the funds to Brown to protect the equipment lease; and that they were therefore entitled to deduct the $25,000 in full on the return which they filed for the fiscal year ended September 30, 1966. [2]
If we assume that the loan was made to protect the lease, we must nevertheless sustain respondent's determination. For Albert's interest in the lease derived exclusively *98 from his investment in shares of Broad Steet stock. His purpose in protecting the lease was therefore to enhance the value of his investment. Accordingly we hold that Brown's failure to repay the loan resulted in a non-business bad debt. Whipple v. Commissioner,supra.
Issue 3. Depreciation (219 Sixth Avenue North)
FINDINGS OF FACT On December 31, 1965, Albert purchased real estate located at 219 Sixth Avenue North, Nashville, Tennessee. When Albert purchased the property it was improved by a building which contained heating and air conditioning equipment and an elevator. The contract for the sale of the real estate provided that the purchase price would be paid as follows: $65,000 on the delivery of the deed; $61,666.67 on December 31, 1966, and on December 31, 1967; and $61,666.66 on December 31, 1968. Albert agreed to keep the building insured for no less than $185,000 until his obligations under the contract of sale were fully discharged. Shortly before Albert purchased the property he had his insurance agent obtain an estimate of the present cost of replacing the building at 219 Sixth Avenue North. On the basis of this estimate, Albert insured *99 the building for $227,080. For the year 1966 the division of assessment of the metropolitan government of Nashville and Davidson County appraised the land at $101,750 and the building at $130,750. OPINION Sec. 1. 167(a)-5, Income Tax Regs., provides: In the case of the acquisition on or after March 1, 1913, of a combination of depreciable and nondepreciable property for a lump sum, as for example, buildings and land, the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the value of the entire property at that time. * * * In applying this regulation to 219 Sixth Avenue North, Albert allocated $227,379.50 of the purchase price to the building and the balance of $22,620.50 to the land. Respondent determined that $130,750 should have been allocated to the improvements and $119,250 to the land. Petitioners have the burden of proving that the relative values of the land and improvements at 219 Sixth Avenue North justify the allocation which Albert made; and to sustain *100 that burden they rely on the estimate of the costs of replacing the improvements which was obtained for Albert by his insurance agent. In view of the countervailing weight of the appraisal made by the division of assessments, such evidence as petitioners rely on would not justify our resolving this issue in their favor. Neither does the record fully support respondent's determination. On the basis of the relative values of the land and building as determined by the division of assessments, we allocate $109,408.60 of the purchase price to the land and $140,591.40 to the building. For the purpose of computing the depreciation allowable annually with respect to the property, Albert allocated the basis which he assigned to the improvements in the following manner: $192,379.50 to the building itself, and $25,000 and $10,000, respectively, to the heating and air conditioning equipment and to the elevator which the building contained. To the building he then assigned a 20-year useful life, while to the heating and air conditioning equipment and to the elevator he assigned 10-year useful lives. Furthermore, with respect to the heating and air conditioning equipment and to the elevator, petitioners *101 claimed a deduction for additional first-year depreciation under section 179. Section 179 permits a taxpayer to claim additional depreciation with respect to certain tangible personal property in the first year for which a depreciation deduction is allowable in respect of that property. Respondent contends that neither the elevator nor the heating and air conditioning equipment were tangible personal property within the meaning of section 179. Sec. 1.179-3(b), Income Tax Regs., provides: For purposes of section 179, the term "tangible personal property" [excludes] land, and improvements thereto, such as buildings or other inherently permanent structures thereon (including items which are structural components of such buildings or structures). * * * This definition of tangible personal property plainly excludes elevators. We therefore hold with respect to the elevator in the building at 219 Sixth Avenue North petitioners were not entitled to claim additional first-year *102 depreciation under section 179. The above definition also excludes central temperature control appareatus but not individual temperature control units. From the evidence introduced at trial we are unable to ascertain the kind of temperature control equipment which was installed in the building at 219 Sixth Avenue North. We therefore hold that in respect of that equipment petitioners were not entitled to claim additional first-year depreciation under section 179. [3]
As petitioners have done in this instance, a taxpayer may allocate the cost of a building among its components and depreciate each component over its useful life. Should a taxpayer attempt to follow this procedure, however, he has the burden of proving that the cost of the building was allocated *103 among the components proportionately with their relative values, and that the useful life of each component was correctly determined. Harsh Investment Corporation v. United States, an unreported case, ( D.C. Ore. 1970, 27 AFTR 2d 71-706, 70-2 USTC par. 9638). The record is devoid of evidence pertaining either to the relative values of the component parts of the building at 219 Sixth Avenue North or to their useful lives. We therefore hold as has been contended by respondent that the building must be depreciated as a unit which had a useful life of 20 years at the time of purchase. Issue 4. Depreciation (2800 West End Avenue)
FINDINGS OF FACT On October 2, 1967, Albert purchased land and a building at 2800 West End Avenue, Nashville, Tennessee, for $110,000. For the year 1966, the division of assessments of the metropolitan government of Nashville and Davidson County appraised the land at $37,500 and the building at $62,500. The owners of the property previous to Albert had insured the building for $74,700 under policies written with an 80 percent co-insurance clause. OPINION In applying section 1.167(a)-5, Income Tax Regs. *104 , to the property at 2800 West End Avenue, Albert allocated $100,210 to the building and the balance of $9,790 to the land. Respondent contests the allocation; and the burden is on petitioners to prove that the relative values of the land and building justify the allocation. In support of the allocation, petitioners direct our attention to the amount of insurance maintained by the previous owners of the property. In our opinion such evidence is insufficient as a counterweight to the appraisal made by the division of assessments. On the basis of the relative values of the land and building determined by the division of assessments in that appraisal, we allocate $41,250 of the purchase price to the land and $68,750 to the building. Issue 5. Interest Expense Deduction
FINDINGS OF FACT On September 27, 1965, Albert executed, pursuant to a loan agreement, a promissory note in the amount of $180,000 payable to the Third National Bank in Nashville. The note was due on December 1, 1966, and provided that interest be paid at the rate of six percent annually. When the note was issued, the bank credited only $167,100 to Albert's account. OPINION On the return which they filed *105 for the taxable year ended September 30, 1965, petitioners deducted $12,900 as interest paid on the loan of $180,000. Respondent disallowed this deduction, claiming that $12,900 in interest had not been paid by Albert, a cash basis taxpayer, during the year in issue. [4] We sustain respondent's determination on the authority of Cleaver v. Commissioner,158 F.2d 342 (7th Cir. 1946), affg. 6 T.C. 452 (1946), cert. denied, 330 U.S. 849 (1947). Decision will be entered under Rule 155.
Footnotes
1. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) * * * There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- * * * (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.↩
2. At trial petitioners suggested that Brown's obligation may have become worthless in the fiscal year ended September 30, 1965. On brief they reverted to the position of their pleadings, that the obligation became worthless in the following fiscal year. In our opinion, the position taken in the brief is in accord with the record.↩
3. Even if the elevator and temperature control equipment were tangible personal property within the intendment of section 179↩, we would have to deny petitioners' additional first-year depreciation in this instance; for there is nothing in the record tending to corroborate the basis allocation which Albert made in respect of these items.
4. SEC. 163. INTEREST. (a) General Rule.--There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.↩